# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Case No.: 3:18-CR-0246 (JBA)** |
| | ) | **3:20-CR-0019 (JBA)** |
| -v- | ) | |
| | ) | |
| **ARCADIO DONES** | ) | **MAY 27, 2021** |

## <u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AMENDMENT OF SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)</u>

The defendant, Arcadio Dones ("Defendant"), through undersigned counsel, hereby respectfully submits this supplemental memorandum of law in support of Mr. Arcadio's pending motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A). Mr. Dones presents extraordinary and compelling reasons to reduce his sentence in light of the following considerations:

- The approximately 30 months' imprisonment that he has served have been exceptionally harsh, isolating and restrictive due to COVID-19 quarantines and other lockdowns and the impact they have had on his mental health, *see* Declaration of Dr. Eden Almasude, Exhibit D; medical issues and poor medical care, *id.*; the lack of educational or rehabilitative programming; and, for much of the time, the distance from home.

- He is not getting the services, care or support that the Court, at sentencing, emphasized he should receive.

- He remains vulnerable to COVID despite his vaccination, *id.*

- He demonstrates strong rehabilitation.

- He is positioned to resume a productive role in his family and in society.

- And, the 18 U.S.C. § 3553(a) factors favor a reduction of his sentence.

In addition, Mr. Dones has satisfied the exhaustion requirement under Section 3582(c)(1)(A).

For these reasons, as explained further below, the Court should reduce Mr. Dones'
sentence.

## FACTUAL BACKGROUND

This Court sentenced Mr. Dones on September 17, 2020, to a Guidelines sentence of
100 months of imprisonment followed by a four years of supervised release, for violation of 21
U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(vi) and 922(g)(1).  Mr. Dones had already been
imprisoned, pending sentencing, for approximately two years, at Wyatt and New Haven
Correctional Center.  During much of that time, Mr. Dones was serving under the particularly
harsh conditions imposed in response to the COVID-19 pandemic.  Even before the pandemic,
Mr. Dones' time in custody was difficult, insofar as no positive programming was available to
him at these facilities.

Mr. Dones' prison conditions have remained hard under BOP custody since sentencing,
as explained further below.  Defense counsel did not highlight the difficult sentencing
conditions for the Court at sentencing nor ask for a below-Guidelines sentence on account of
those conditions.

Even at the time of sentencing Mr. Dones was suffering significant health problems.
The PSR reported that Mr. Dones suffered from solitary kidney, had received an implant to his
digestive track and was obese (5'7", 230 pounds, which equates to a BMI of 36, in the
"obese" category;[1]  PSR ¶ 52.  Defense counsel noted for the Court that his health issues left
him acutely aware of the shortened lifespan he would likely experience as a consequence and

---

[1] CDC Adult BMI Calculator,
https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html  (last
accessed May 27, 2021).

2

asked for leniency on that basis. Among the health issues cited by counsel was a liver imaging procedure that had been conducted the previous day. Sentencing Tr. at 15. However, counsel was apparently unaware of the severe liver disease that afflicts Mr. Dones. *See* Sentencing Tr. at 15. Counsel did not seek a below-Guidelines sentence at sentencing because of the risks that Mr. Dones would face due to his health in prison.[2] The Court noted briefly that it had concern in that regard, particularly in light of the COVID epidemic, but the Court stated that it would "have to rely at this point on the effective procedures in the Bureau of Prisons' facilities to protect the inmates as well as the Bureau of Prisons' obligation to attend to his health needs." Sentencing Tr. at 22.

In imposing sentence, the Court emphasized that Mr. Dones would have available "programs that the Bureau of Prisons runs, both in terms of parenting programs, drug treatment programs, English as a second language programs, occupational training programs." Sentencing Tr. at 18-19. The Court agreed with defense counsel's request for a recommendation that Mr. Dones be held at the prison facility in Danbury or as close to Connecticut as possible. Sentencing Tr. at 26. It also stated that it was recommending that Mr. Dones "be permitted to participate in an ESL program . . . . occupational education and . . . the course that they are now offering in the Bureau of Prisons on parenting." Sentencing Tr. at 26-27. The judgment memorialized the recommendations to BOP:

> The Court recommends the Defendant be designated to FCI Danbury or
> as close to Connecticut as possible to maintain family relationships, to
> allow the Defendant the opportunity to participate in the 500-hour drug
> rehabilitation program (RDAP), to enable the Defendant to pursue

---

[2] The defendant, respectfully, reserves his right to pursue habeas relief.

3

educational advancement, to participate in an ESL program, an occupational education program and a parenting course.

Judgment, ECF No. 86 at 2.

In serving his sentence under BOP custody, Dones has been held primarily at Hazelton FCI in West Virginia (after a short stay at Otisville and at FTC Oklahoma City). He has not been able to participate in *any* programs, because such programs have not been offered due to COVID-19 restrictions.[3]

He has had no visits from his daughter, other family, or anyone else. For months, visitation was restricted. In any event, loved ones are unable to visit because the facility is too far from home.

Mr. Dones has advised that he has passed much of his time in quarantine (on at least five occasions). The restrictions were stringent and potently isolating, as described further below. They also lasted a long time (up to 25 days on one occasion). Moreover, as described further below, he has been placed under very restricted conditions the rest of the time.

Moreover, Mr. Dones' health has continued to deteriorate in prison. Since sentencing he has been diagnosed with cirrhosis, latent tuberculosis, and depression and treated for potentially life-threatening infections. At this time, based on the review of his medical records, as summarized by Dr. Eden Almasude, "Notable medical conditions include a gunshot wound with resulting right nephrectomy (removal of the kidney), artificial esophagus, and a ventral hernia measuring ∼5cm by 12cm; liver cirrhosis; persistent rash of unclear etiology;

---

[3] The conditions of confinement described herein are based on the undersigned's understanding of the information reported by Mr. Dones. Although the slowness of BOP's scheduling conversations, and the limited time allowed, on top of the slowness of mail services, have prevented preparation and submission of a declaration executed by Mr. Dones, this (or a remote hearing) could of course be arranged for a later date, should the Court deem that necessary.

4

thrombotic thrombocytopenic purpura (TTP, leading to a low platelet count); asthma; severe periodontal disease; bilateral lower extremity edema (swelling); gallstones; and blurred vision. He was hospitalized from 11/24/2020 – 11/30/2020 at Rhode Island Hospital for possible pyelonephritis requiring IV antibiotics and treatment for herpes zoster infection [shingles].[4] Mr. Dones was also treated for latent TB in October 2018." Moreover, he has suffered "mental health complications during incarceration" after many months of the restrictive, isolating conditions and anxiety about the prospect of contracting COVID-19. *See* Declaration of Eden Almasude, MD, Exhibit D hereto. His care has not been good. *See id.* Further information regarding Mr. Dones medical situation and conditions of confinement is presented below.

Mr. Dones has had no disciplinary infractions while in BOP custody. His record was also good during his pretrial custody. He received no discipline at NHCC. In Wyatt, in January 2019, he was placed in segregation for a minor infraction. It seems that he received nine days in restrictive housing pending an investigation because he expressed a preference for segregation over a move that would result in his getting a new cellmate; he was charged with refusing or resisting housing, and readily admitted the infraction. He received no tickets for any other issue. *See* Disciplinary Records, Exhibit A hereto.

On April 19, 2021, the Court docketed Mr. Dones' *pro se* motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). On April 21, the Court assigned the undersigned as counsel for Mr. Dones.

---

[4] CDC, Shingles (Herpes Zoster), https://www.cdc.gov/shingles/index.html (last accessed May 27, 2021).

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

The undersigned sent the attached April 27 request to the warden of Hazelton FCI to bring a motion for compassionate release on Mr. Dones' behalf. *See* Mr. Dones' Letter to Warden, Exhibit B hereto. The prison thereafter served on Mr. Dones the warden's response dated May 6, 2021, rejecting the petition. *See* Warden's Response, Exhibit C hereto.

## APPLICABLE LAW

Section 3582(c)(1)(A) provides in pertinent part as follows:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A).

In recently allowing courts to grant sentence reduction pursuant to the motion of the defendant, "Congress intended to expand, expedite, and improve the process of compassionate release. *United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020). . . . '[T]he only statutory limit on what a court may consider to be extraordinary and compelling [circumstance warranting relief] is that rehabilitation alone shall not be considered an extraordinary and compelling reason. *Id.* at 237-38." *United States v. Rios*, *2, 3:94cr112(JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020).

Courts are not limited to what is specified as "extraordinary and compelling reasons" by Guideline Section 1B1.13, Note 1, "and may exercise their discretion in determining if the

confluence of all the issues raised in defendants' motion for release warrants granting them." *Id.* *2-*3 (citations omitted). Although in many recent cases, the risk to the defendant's health due to COVID-19 was decisive, *see, e.g., id.; United States v. Perez*, 3:02-cr-00007(JBA), ECF No. 1474 (D. Conn. Mar. 4, 2021); *United States v Gil-Grande*, 3:16019(VAB), 2020 WL 5868339 (D. Conn. Oct. 2, 2020) ("numerous courts within this Circuit have held that a defendant's pre-existing health conditions in combination with the increase risks of COVID-19 in prisons constitute 'extraordinary and compelling reasons' warranting relief"), the health conditions relevant to an "extraordinary and compelling" determination need not be so restricted.

As this Court has stated, courts are not under any constraint "to consider primarily those acute health problems created by the pandemic." *Rios*, 2020 WL 726440 at *2. A lack of health care services or other services that the Court envisioned at the time of sentencing, independent of COVID risk, has also been decisive. *See, e.g., United States v. Hatcher*, 18-cr-454-10(KPF), 2021 WL 1535310, *2 (S.D.N.Y. April 19, 2021) (granting early release notwithstanding receipt of COVID vaccine because, among other things, defendant "has been unable to receive mental health care, drug abuse treatment, and other important services that the Court envisioned her receiving while incarcerated").

Indeed, entirely independent of any health risks, courts have opted to reduce the sentence of even young and healthy defendants due primarily to the "no doubt harrowing conditions presented by COVID-19," including "far more restrictive conditions of confinement" and "limits on access to visitors, including family, far beyond what the Court

7

expected at sentencing." *United States v Romero*, 15-cr-447(PAE), 2021 WL 1518622 at *1, *4 (S.D.N.Y. Apr. 16, 2021).[5]

---

[5] Below is a further list of some of the compassionate release grants after the defendant received a COVID-19 vaccination. In some cases, the defendant received two doses and had also recovered from COVID-19 (decisions unavailable on Westlaw are attached hereto as Exhibit E).

- *United States v. Spriggs*, CCB-10364, 2021 WL 1856667 (D. Md. May 10, 2021) ("the fact that [defendant] received a vaccine does not negate that his underlying health conditions make him eligible for compassionate release").

- *United States v. Carr*, 06-cr-275 (TCB)(N.D. Ga. May 4, 2021)(releasing inmate after receipt of the Pfizer vaccine, noting scientific uncertainties as to vaccines' efficacy amidst variants and hardships of detention amidst lockdowns) (citing *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) (quoting *United States v. Mel*, No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020))).

- *United States v. McLean*, 1:97-cr-00163-LMB, Doc. 46 (E.D. Va. Apr. 23, 2021 (releasing inmate with heart disease who recovered from COVID-19 and received one dose of the vaccine at the time the court granted motion and was expected to receive the second dose before his release).

- *United States v. Ricks*, 1:17-cr-00134-JMS-TAB, 2021 WL 1575950 (S.D. Ind. Apr. 22, 2021)(releasing inmate who had chronic kidney disease, hypertension, and anemia after receipt of both does of the Pfizer vaccine, and after (partial) recovery from COVID-19).

- *United States v. Fortanel*, 3:18-cr-5383-GPC-1 (S.D. Cal. Apr. 22, 2021)(releasing inmate with obesity and latent tuberculosis, significant rehabilitation, who had received the Pfizer vaccine, expressing concern regarding the COVID variants, and the uncertainty as to duration of immunity, as well as the potential for further outbreaks in prison and the inability for self-care).

- *Unites States v. Sweet*, No. 07-20369, 2021 WL 1430836 (E.D. Mich. Apr. 15, 2021) (Government appeal pending) (releasing vaccinated 73 year-old with kidney disease who had recovered from COVID-19 and received the Moderna vaccine).

- *United States v. Chiampi*, 14-cr-84(BRM)(D.N.J. April 12, 2021)(releasing inmate who had received two vaccine doses).

- *United States v. Pappa*, No. 95-00084-CR, 2021 WL 1439714, at *4 (S.D. Fla. Apr. 1, 2021) (reducing sentence despite vaccination, noting ongoing risks).

- *United States v. Parish*, 2:07-cr-00578-RMG (D. S.C. Mar. 17, 2021) (releasing inmate with obesity and other medical problems who had received one dose of vaccine, was expected to receive another and had recovered from COVID-19).

- *United States v. Bradshaw*, No. 1:96-CR-10032-DPW (D. Mass. Mar. 4, 2021) (Government appeal pending) (releasing inmate who had received both Moderna vaccine doses).

- *United States v. Manglona*, 3:14-cr-05393-RJB (W.D. Wa. Mar. 3, 2021) (releasing inmate with obesity and hypertension who was vaccinated).

8

Section 3582(c)(1)(A) also requires courts to consider the factors provided in 18 U.S.C. § 3553(a), to the extent they are applicable. These include "the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "the need to afford adequate deterrence to criminal conduct," "the need to avoid unwarranted sentence disparities" among similarly situated defendants, need for a particular sentence to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," and the kinds of sentences available. 18 U.S.C. § 3553(a).

## ANALYSIS

Given this legal framework, and the relevant facts, the Court should grant Mr. Dones' motion for reduction of his sentence. Mr. Dones presents extraordinary and compelling reasons to reduce his sentence in light of the following considerations: the approximately 30 months that he has served have been exceptionally difficult due to COVID-19 restrictions and the impact they have had on his mental health, medical issues, the absence of programming, and the distance from home; he is not getting the services, care or support that the Court envisioned at the time of his sentencing; in prison he remains at significant risk from COVID; he demonstrates strong rehabilitation; the 18 U.S.C. § 3553(a) factors favor reducing his sentence; and – should the Court choose to reduce his sentence to time served – he can resume

- *United States v. Murakami*, No. 1:17-CR-10346-DPW, D.E. 80 (D. Mass. Feb. 25, 2021) (releasing inmate with hypertension who had received one dose of the vaccine and would receive second dose prior to release).

- *United States v. Sandoval*, CR14-5105, 2021 WL 673566 (W.D. Wa. Feb. 22, 2021) (releasing defendant with kidney disease, transplant, and diabetes who received one dose of vaccine and recovered from COVID-19).

9

a productive role in his family and in society. In addition, Mr. Dones has satisfied the exhaustion requirement under Section 3582(c)(1)(A).

### 1. **Mr. Dones Has Satisfied the Exhaustion Requirement.**

The exhaustion requirement is no bar to consideration of the merits in this matter. Under Section 3582(c)(1)(A), the Court may grant a defendant's motion for a reduction of sentence where defendant "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." As noted, on April 27, 2021, the undersigned sent the attached request to the warden of Hazelton FCI to bring a motion on Mr. Dones' behalf. Mr. Dones' Letter to Warden, Exhibit B hereto. The prison thereafter served on Mr. Dones the warden's response dated May 6, 2021, rejecting the petition. *See* Warden's Response, Exhibit C hereto. By the time the Court adjudicates this motion, more than 30 days will have elapsed from the receipt of the attached request by the warden of Mr. Dones' facility (and from his rejection of same). Accordingly, the Court may consider Mr. Dones' petition.

### 2. **The Exceptional Hardship of His Incarceration Justifies Reduction of His Sentence.**

The exceptional hardships of Mr. Dones' incarceration constitute "extraordinary and compelling reasons" for reduction of his sentence. 18 U.S.C. § 3582(c)(1)(A). As noted by the Court in *McRae*, courts have long recognized that, all other things being equal, particularly arduous conditions of confinement warrant reduction in the period of incarceration imposed on a defendant:

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring the just sentence. *See, e.g.*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the district court [could] reconsider the defendant's request for a downward departure, and do so in the light of this holding"); *United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (summary order) (noting that "[i]n imposing the sentence it did, the district court considered … [among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Columbia where he was detained before being extradited to the United States); *United States v. Salvador*, No. 98 Cr. 484 (LMM), 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that the defendant's pre-sentence conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States … warrant a downward departure") . . . .

Numerous courts have applied these same principles in granting Section 3582(c)(1)(A) motions, based on the recognition that "[a] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing." *Romero,* 2021 WL 1518622 at *4 (quoting *United States v. Mcrea*, 17-cr-643(PAE), 2021 WL 142277, *5 (S.D.N.Y. Jan. 15, 2021)); *see also United States v. Cruz*, 18-cr-81(SRU), 2021 WL 1268253, *3 (D. Conn. Apr. 6, 2021) (same).

Courts have recognized that such conditions can themselves constitute extraordinary and compelling circumstances that justify a sentence reduced from that originally imposed. *See, e.g., Romero*, 2021 WL 12518622 at *1, *4. Courts have also recognized that lack of needed and recommended drug rehabilitation, medical care or other programing weigh in favor of granting motions for reduction in sentence. *See, e.g., United States v. Jones*, 18-cr-81(SRU)

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

2021 WL 1197803, *6-*7 (D. Conn. Mar. 30, 2021) (releasing defendant after 21 months served of 60 month mandatory minimum in part because of "the harshness of incarceration during the pandemic as a result of necessary lockdowns and quarantines" and because "Jones is not able to take advantage of training programs or drug treatment [in prison] because of lockdowns required by the Covid-19 pandemic"); *United States v. Foozailov*, 17-cr-262(LGS), 2021 WL 1894273 (S.D.N.Y. May 11, 2021) (granting a "modest reduction in sentence" to defendant who had already received a COVID vaccine because of "the harshness of Defendant's sentence" due to anxiety and lockdowns caused by COVID-19 and because of defendant's "worsening vision problems and [the prison's] treatment of those problems").

Mr. Dones, too, deserves a reduction in his sentence in light of the exceptional rigor of his incarceration. Mr. Dones has passed much of his time in quarantine (on at least five occasions, one for each transfer he has undergone since onset of the pandemic: Wyatt to New Haven Correctional (NHCC); NHCC to Wyatt; Wyatt to Otisville; Otisville to Oklahoma City; Oklahoma City to Hazelton). During quarantine he was kept in his cell virtually 24 hours a day, for weeks. He was housed alone for about a week. Most of the quarantine periods stretched for more than two weeks due to restrictions on movement within the facility. One quarantine– at Hazelton - lasted 25 days; during those 25 days, he was allowed out of his cell not more than once every five days, handcuffed, for a brief shower.

He has been placed under very restricted conditions the rest of the time. He reports that he was allowed out of his cell for only about 30 minutes a day, and not more than 60, since the onset of the epidemic until relatively recently, even when not in one of the frequent quarantines. This went on for at least 13 months. He was able to interact in a very limited

12

way with only the other inmates in his small unit – approximately five people most of the time, and not more than 10.

Even after receiving his COVID-19 vaccinations, his conditions of confinement have been remained relatively restrictive. He has been able to spend time only with other inmates in his pod. And still no programs have begun nor announcement made as to when they will begin.

In addition, since the onset of the pandemic, Mr. Dones has had few if any visitors. For months, pandemic restrictions blocked visitors. Thereafter, the distance of his custody from Connecticut and Puerto Rico precluded visits from his young daughter, or any other family or loved ones.

He has had no drug rehabilitation counseling, no vocational training, no ESL instruction – no programming or training whatsoever; it was all cancelled due to COVID-19 restrictions. Before the pandemic, it was not available due to his being housed on a pre-trial basis at interim facilities (NHCC and Wyatt, where such programming was not offered to pretrial inmates).

Moreover, this has been a time of great anxiety for him. His medical conditions have rendered him particularly vulnerable to COVID-19. His obesity ("class 2" obesity: weight 230 lbs., height 5"7", equating to a BMI of 36), cirrhosis, latent TB, and solitary kidney placed his health in grave jeopardy from the virus.[6] Even if he survived such an illness, he would likely

---

[6] *See, e.g.,* Centers for Disease Control and Prevention, What to Know About Liver Disease and COVID 19, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (last accessed April 26, 2021); Dong Ji, Dawei-Zhang, Tieniu Yang, Jinsong Mu, Peng Zhao, Jing Xu, Chen Li, Gregory Cheng, Yudong Wang, Zhu Chen, Enqiang-Qin, and George Lau, Effect of Covid-19 on Patients with Compensated Chronic Liver Diseases, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7391917/ (last accessed

13

face serious complications, such as loss of respiratory capacity, loss of digits, and neurologic damage.

These risks were rendered substantially greater by the scope of the outbreak in the prison systems in which he has been held. For example, according to BOP's website (accessed on May 21, 2021), "45,682 inmates and 6,2828 staff have recovered. There have been 236 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-198 disease." At the same time, according to BOP, it "has 129,033 federal inmates . . . and 13,827 in community based facilities." This is a stunning acknowledgement: almost 1/3 of its inmate population contracted COVID-19, plus thousands of additional staff.[7] Mr. Dones' anxiety about the situation was certainly well founded.

Moreover, even after widespread vaccination, no programs have begun. There has not even been an announcement as to when they will begin.

In addition, significantly, Mr. Dones has struggled with serious physical and mental illness during his imprisonment, including depression that has been caused or aggravated by the isolating and restrictive conditions of incarceration during the pandemic and the aforementioned anxiety. As indicated by the attached affidavit of Dr. Eden Almasude, resident

---

April 26, 2021); John Sperati, MD, Coronavirus: Kidney Damage Caused by COVID-19, available at https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-kidney-damage-caused-by-covid19 (last accessed April 26, 2021); Center for Disease Control and Prevention, Obesity Worsens Outcomes for COVID-19, https://www.cdc.gov/obesity/data/obesity-and-covid-19.html#COVID19 (last accessed April 26, 2021); Padma Nagappan, San Diego State University, *COVID-19 could activate latent tuberculosis* (Sept. 22, 2020), https://newscenter.sdsu.edu/sdsu_newscenter/news_story.aspx?sid=78173 (last accessed May 27, 2020).

[7] BOP, COVID-19, https://www.bop.gov/coronavirus/ (last accessed May 26, 2021). At Otisville, even today three inmates suffer active infection; at least 85 inmates and 37 staff have contracted COVID-19 there. At Hazelton FCI, one staff person currently has the disease, and the numbers overall are 139 and 77, respectively, while at Hazelton USP, another 87 and 163, respectively, have contracted the disease. At the facility in Oklahoma City, BOP reports that 362 inmates have had the disease. *Id.* The Court may take judicial notice of the regular reports over the last 14 months from the U.S.M.S. for the District of Connecticut as to the prevalence of COVID-19 at Wyatt.

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

physician at Yale New Haven Hospital, who has reviewed all available records pertaining to Mr. Dones' health during his imprisonment, Mr. Dones has suffered serious impairment of his health and risks to his life during this time, some of which has arisen or been aggravated by what has happened to him during imprisonment. *See* Declaration of Dr. Eden Almasude, Exhibit D hereto. These include the following:

- Depression most likely caused, or aggravated, by Mr. Dones' stringently isolating and and restrictive conditions of incarceration during the pandemic.

- Anxiety regarding the risks to him of contracting COVID-19, given his poor underlying health.

- Solitary kidney, which is rendered particularly threatening to his health by certain circumstances, such as the prison's treatment of his lower leg edema with NAISD's.

- Lower leg swelling, pain and cramping.

- Shingles, or "zoster," a painful condition that poses serious health risks to those who have only one kidney.

- Serious periodontic disorder (bleeding gums).

- An underlying platelet disorder, which interferes with normal coagulation.

- A persistent itchy rash across his entire body, for which he has received no helpful treatment from the prison medical resources.

- Serious liver disease, which may contribute to numerous of the above conditions.

- And a dangerous infection of his solitary kidney.

*See,* Declaration of Dr. Eden Almasude, Exhibit D hereto. Many of these conditions are new or were not mentioned in the PSR or at sentencing. In light of them, Mr. Dones clearly has had a particularly, and unexpectedly, hard experience during his incarceration.

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

Dr. Almasude describes the psychological symptoms that have developed on account of his incarceration under the stringent conditions he has faced; she also describes the risks of severe and long-lasting psychological harm to which he has been subjected through the restrictive conditions imposed upon him, especially the solitary confinement he endured and the lengthy periods of almost total lockdown during his many episodes of quarantine:

> Mr. Dones has mental health complicacions during incarceration. Notably, his pre-sentence report stated that he had no prior history of mental health treatment or concerns. However, while incarcerated he was diagnosed with a "depressive disorder" (11/01/2020) and reports significant anxiety amidst the COVID-19 pandemic, during which 1 in 3 incarcerated individuals has tested positive; this is 3.8 times higher than the positivity rate in the state of Connecticut.

> Mr. Dones has been in quarantine several times, in severe lockdown conditions. The state of highly restrictive lockdown (with or without a cellmate), with confinement, social isolation, and a forced sedentary state has significant physical and mental health effects. For example, lack of physical activity can worsen his lower extremity edema. In particular, solitary confinement is a form of psychological torture according to the UN Special Rapporteur on torture, specifically referencing the Connecticut Department of Corrections. There are extensive data on the consequences of solitary confinement including increased rate of suicide attempts, perceptual disturbances, dysregulated sleep, depression, nightmares, and hypervigilance.

Declaration of Dr. Eden Almasude, Exhibit D hereto (footnotes omitted). Significantly, "While solitary confinement can include a cellmate, such confinement can still inflict similar negative psychological effects." Southern Poverty Law Center, *Solitary Confinement: Inhumane, ineffective and wasteful* (2019). [8]

---

[8] Available at https://www.splcenter.org/sites/default/files/com_solitary_confinement_0.pdf (last viewed May 27, 2021). The practice of prison officials confirm that the punishing impacts of "solitary" persist with or without a cellmate: the population of the special management or restricted housing units of federal prisons, to which inmates are routinely consigned as punishment for prison infractions, consists largely of double-cell solitary. According to press reports, "Double-cell solitary is a common practice in federal prisons, where more than 80

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

Moreover, as described further below, Mr. Dones has received substandard care. For example, he has not received mental health treatment, and his care has been poor in certain other respects described below.

In short, Mr. Dones has done exceptionally hard time for approximately two-and-a-half years. Many of the peculiar hardships of his incarceration continue due to his medical conditions, and the ongoing restrictions and suspension of programming imposed due to the pandemic. "[I]ncarceration in such conditions is, unavoidably, more punishing" than normal imprisonment. *Romero,* 2021 WL 1518622 at *4. These considerations, alone, constitute "extraordinary and compelling" reasons for reducing his sentence below the Guidelines' sentence that he originally received, and even a basis for releasing Mr. Dones on time already served.

### 3. Mr. Dones Is Not Receiving the Care, Support or Services that the Court Envisioned at Sentencing.

Mr. Dones should also receive a decreased sentence because the prison system has not been providing him the care, support or services that the Court envisioned at sentencing. Courts have held that such circumstances weigh in favor of reduction of the sentence originally imposed. *See, e.g.*, *Hatcher*, 2021 WL 1535310 (court ordered early release notwithstanding defendant's receipt of the COVID vaccine because, among other things, defendant had "been unable to receive mental health care, drug abuse treatment, and other important services that the Court envisioned her receiving while incarcerated"); *Jones*, 2021 WL 1197803, *6-*7 (releasing defendant after 21 months served of 60 month mandatory minimum in part because

---

percent of the nearly 11,000 inmates in restricted housing have a cellmate." Christie Thompson, The Marshall Project, *Inside Lewisburg Prison*, NPR (Oct. 26, 2016) (last accessed on May 27, 2021).

"Jones is not able to take advantage of training programs or drug treatment [in prison] because of lockdowns required by the Covid-19 pandemic").

Here, too, in imposing sentence, the Court envisioned that certain support, services and opportunities would be made available to the defendant. As memorialized by the judgment,

> The Court recommends the Defendant be designated to FCI Danbury or as close to Connecticut as possible to maintain family relationships, to allow the Defendant the opportunity to participate in the 500-hour drug rehabilitation program (RDAP), to enable the Defendant to pursue educational advancement, to participate in an ESL program, an occupational education program and a parenting course.

Judgment, ECF No. 86 at 2. Yet, contrary to these expectations, Mr. Dones (who had a methadone dependency upon arrest, PSR ¶ 53) has not had any drug counseling, or any programming of any sort. None has been available, due to prison restrictions imposed because of COVID-19.

At sentencing, the Court also noted concerns for Mr. Dones' health, stating that it would "rely at this point on the effective procedures in the Bureau of Prisons' facilities to protect the inmates as well as the Bureau of Prisons' obligation to attend to his health needs." Sentencing Tr. at 22. But Mr. Dones' medical condition has worsened beyond what was apparent at sentencing, and he is not receiving proper care in prison. For example, he has been prescribed and given ibuprofen for the persistent pain in his legs, even though he has only one kidney and NSAID's are therefore counter-indicated. Declaration of Dr. Eden Almasude, Exhibit D hereto. He has received no effective treatment for the itchy rash all over his body. He has not undergone the testing that would determine whether many of these varying symptoms (rash, leg swelling, gum bleeding, low platelet count) are symptoms of severe

cirrhosis – for which he is receiving no treatment. He has received no drug counseling, despite an active addiction upon arrest. And he seems to be receiving no mental health care despite the psychological hardships of his stringent conditions of confinement, the anxiety and fear induced by the risk of contracting COVID and his diagnosed depression. As summarized by Dr. Almasude:

> From medical records, it appears that he is not currently receiving any treatment for his cirrhosis. Mr. Dones also has a persistent rash, described as a "macular rash, confluently spread over chest and back, pruritic in nature." This could be a skin manifestation of his liver disease, especially given that the rash is constant and has not improved despite topical and systemic treatments. Liver disease is also one of many possible etiologies for Mr. Dones' lower extremity swelling, leading to discoloration, cramping, and pain. His bleeding gums may be a result of prolonged bleeding time secondary to liver disease. Overall, these issues suggest that he needs further medical workup and specialized care from gastroenterology. . . .

> On review of Mr. Dones' medical records, it is my professional opinion that he has significant and concerning health issues. He has not received mental health treatment and may not be receiving appropriate diagnosis and medical care as evidenced by being given a medication (frequent ibuprofen) that is contraindicated, rash that has not responded to treatment and can be a sign of underlying disease, and ongoing and painful lower extremity swelling.

Declaration of Dr. Eden Almasude, Exhibit D hereto.

Additionally, as noted, he has had no visits from family. This is largely due to BOP's going against the Court's recommendation and incarcerating him far away from Connecticut.

These circumstances constitute an independent basis for reduction of the sentence imposed by the Court.

19

**4. The Ongoing COVID-19 Risk for Mr. Dones Also Constitutes Extraordinary and Compelling Reasons Justifying a Reduction in Sentence.**

The ongoing risk to Mr. Dones' health posed by COVID-19 because of comorbidities and his living in a confined, densely populated circumstance also constitutes extraordinary and compelling reasons that further justify a reduction in his term of imprisonment. As stated by Dr. Almasude:

> The above listed medical conditions put Mr. Dones at higher risk for complications from COVID-19. Although vaccinated, the high rates of COVID transmission in group living settings such as prisons and jails raises the likelihood of new variants of the SARS-CoV-2 virus.

Declaration of Dr. Eden Almasude, Exhibit D hereto; *see also* footnote 6, *supra*, and accompanying text.

Multiple variants of the virus that causes COVID-19 have been documented in the United States and globally during this pandemic.[9] The CDC currently recognizes five variants of concern (VOC) in the United States:

- B.1.1.7: This variant was first identified in the U.S. in December 2020. It was initially detected in the U.K.

- B.1.351: This variant was first identified in the U.S. at the end of January 2021. It was initially detected in South Africa in December 2020.

- P.1: This variant was first detected in the U.S. in January 2021. P.1 was initially identified in travelers from Brazil, who were tested during routine screening at an airport in Japan, in early January.

- B.1.427 and B.1.429: These two variants were first identified in California in February 2021 and were classified as VOCs in March 2021.[10]

---

[9] CDC, *About the Variants*, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html#:~:text=CDC%20tracks%20multiple%20variants%20circulating%20in%20the%20United,is%20the%20most%20common%20variant%20across%20the%20country (last accessed May 26, 2021).

[10] *Id.*

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

In addition to the variants of concern recognized by the CDC, the B.1.617 variant, commonly referred to as the "double mutant" COVID variant, has emerged in the United States.[11] This variant, also known as the India variant, may be the cause of the recent outbreak in that country.[12] According to the CDC, scientists are working to learn more about these variants, and more study is needed to understand how widely these new variants have spread; how the disease caused by these new variants differs from the disease caused by other variants that are currently circulating; and how these variants may affect existing therapies, vaccines, and tests. *Id*.

Early studies by researchers in Israel and St. Louis have indicated that existing vaccines are likely of diminished effectiveness against certain variants.[13] The CDC indicates that there remain many open questions (and therefore areas of risk) in terms of how effective the vaccines are against the new variants of COVID-19, as well as the effectiveness and duration of the protection offered by the vaccines, the degree to which vaccinated persons spread the disease, and how many people must be vaccinated to reach population immunity and.[14] Thus, for example, unless one is sure that everyone in a group is vaccinated, the CDC continues to

---

[11] Herb Scribner, *Double Mutant of Covid Has Been Found in California* Deseret News (April 6, 2021) https://www.msn.com/en-us/health/medical/double-mutant-of-covid-19-has-been-found-in-california/ar-BB1fkWOn (last accessed May 27, 2021).

[12] William Hazeltine, *An Indian SARS-CoV-2 Variant Lands In California. More Danger Ahead?*, Forbes (April 12, 2021) https://www.forbes.com/sites/williamhaseltine/2021/04/12/an-indian-sars-cov-2-variant-lands-in-california-more-danger-ahead/?sh=388da4493b29 (last accessed May 27, 2021).

[13] *See, e.g.* Tamara Bhandari, Washington University School of Medicine, *New evidence COVID-19 antibodies, vaccines less effective against variants: Worrisome new coronavirus variants can evade antibodies that neutralize original virus* (Mar. 4, 2021), https://medicine.wustl.edu/news/new-evidence-covid-19-antibodies-vaccines-less-effective-against-variants/ (last accessed May 27, 2021); Adam Barnes, *Alarming new study shows South African variant can 'break through' Pfizer vaccine,* The Hill (April 12, 2021), https://thehill.com/changing-america/well-being/prevention-cures/547636-alarming-new-study-shows-south-african-variant (last accessed May 27, 2021).

[14] CDC, *Key Things to Know*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html?s_cid=10499:what%20is%20the%20covid%2019%20vaccine:sem.ga:p:RG:GM:gen:PTN:FY21 (last accessed May 26, 2021).

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS

recommend mask-wearing when indoors or when outdoors in close proximity to others.[15]

Given Mr. Dones' incarceration, whether he can even avail himself of these means of partially

defending himself is not fully in his control. And, due to his comorbidities, should he contract

the disease or its variants, the consequences could be dire.

Moreover, specific questions have arisen about the efficacy of the vaccine for persons

afflicted with obesity, which is one of Mr. Dones' many risk factors. Early evidence suggests

that, in people who have obesity, the vaccine is not nearly as effective as in those of average

weight.[16] One study showed that people "with obesity produced only about half the amount of

antibodies in response to a second dose of the jab compared with healthy people."[17] Mr.

Dones' body mass index is 36 – class two obesity. Just on this basis, alone, he remains at risk.

These considerations weigh in favor of early release. As stated by the Court in *United

States v. Fortanel*:

> Although Fortanel has been vaccinated and the Pfizer-BioNTech vaccine is
> highly effective, he points out that he still faces some risk of infection and
> serious illness given the limitations of clinical trials and the continued spread
> of the virus in prisons and jails. ECF No. 134 at 15–21; ECF No. 134-1,
> Ex. B. Additionally, the science is currently unclear as to how long such
> immunity lasts, and the spread of new variants adds additional uncertainty.
> See Pengfei Wang et al., Antibody Resistance of SARS-CoV-2 Variants
> B.1.351 and B.1.1.7, Nature, Mar. 8, 2021,
> https://www.nature.com/articles/ s41586-021-03398-2. The Court thus finds
> that Fortanel is unlikely to be able "to provide self-care within the
> environment of a correctional facility" to avoid contracting and suffering
> serious effects of COVID-19 as the virus continues to spread. U.S.S.G. §

    [15] CDC, *After You're Fully Vaccinated*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last accessed May 27, 2021).
    [16] Linda Geddes, *Pfizer Vaccine May Be Less Effective in People with Obesity, Study Says*, The Guardian (Feb. 28, 2021), https://www.theguardian.com/world/2021/feb/28/pfizer-vaccine-less-effective-obesity-study (last accessed May 27, 2021).
    [17] Liji Thomas, M.D., *Obesity may Reduce COVID-19 Vaccine Efficacy, Say Researchers*, News-Medical-Life Sciences (Mar. 2, 2021) (emphasis added)), https://www.news-medical.net/news/20210303/Obesity-may-reduce-COVID-19-vaccine-efficacy-say-researchers.aspx (last accessed May 27, 2021).

1B1.13 cmt. 1(A)(ii). See *United States v. Ramos*, 450 F.Supp.3d 63, 65 (D. Mass. 2020) ("[I]t is not possible for a medically vulnerable inmate . . . to isolate himself in this institutional setting.")."

*United States v. Fortanel*, 3:18-cr-5383-GPC-1 (S.D. Cal. Apr. 22, 2021)(releasing inmate with obesity and latent tuberculosis, significant rehabilitation, who had received the Pfizer vaccine)*, Court Order granting compassionate release, Exhibit E hereto.

Numerous other courts have also relied upon such considerations to find extraordinary and compelling circumstances, despite administration of the vaccine. *See, e.g., United States v. Spriggs,* CCB-10364, 2021 WL 1856667 (D. Md. May 10, 2021) (noting the uncertainties as to "how effective the vaccines are against new variants" of the COVID-19 virus, and holding that "the fact that [defendant] received a vaccine does not negate that his underlying health conditions make him eligible for compassionate release. To conclude otherwise would ignore the remaining unknowns about the protection the vaccine can provide and would create a perverse incentive for prisoners like Spriggs who seek compassionate release on the basis of medical conditions to decline the vaccine for fear it would preclude relief. Presenting prisoners with such a choice is dangerous not only to their health but also to the people with whom they are incarcerated and to BOP staff"); *United States v. Carr*, 06-cr-275 (TCB)(N.D. Ga. May 4, 2021)(releasing inmate after receipt of the Pfizer vaccine, based in part on ongoing risk due to comorbidities and uncertainty as to long term efficacy of vaccines amidst variants); *United States v. Pappa*, No. 95-00084-CR, 2021 WL 1439714, at *4 (S.D. Fla. Apr. 1, 2021) (finding "extraordinary and compelling reasons exist for a reduction of Defendant's sentence based on her underlying medical conditions (including obesity) in conjunction with the threat of contracting COVID-19 in prison" despite defendant being fully vaccinated). The Court here

23

should also reduce Mr. Dones' sentence because of the ongoing risk in prison of mortality or severe illness due to COVID-19.

### 5. Mr. Dones' Rehabilitation Further Qualifies Him for a Reduction in Sentence.

Mr. Dones' rehabilitation further qualifies him for a reduction in sentence. His disciplinary record is clean in BOP, and, pre-sentencing, he had only the one minor incident at Wyatt noted above involving his objection to changing cellmates (for which he already had the steep price of at least nine days in isolation). As noted in the PSR, Mr. Dones (although not a cooperator) was cooperative and compliant upon arrest. He later noted to the probation officer who interviewed him and wrote the PSR his regret for what he had done. PSR, ¶ 17. Since coming into BOP custody, despite the rigors of his incarceration, he has had an entirely clean disciplinary record. *See* Disciplinary Records, Exhibit A.

### 6. Mr. Dones Can Resume a Productive Role in Society.

Should the Court choose to release Mr. Dones, he can resume a productive role in society. The undersigned has spoken to his older sister, Amalia Dones, who is gainfully employed but able to spend most hours at home, owns her own residence and is prepared to allow Mr. Dones to live there and to facilitate any attendance the Court should desire at, for example, drug court or rehabilitation programs. In a return to Connecticut, moreover, he would be able to resume an active role as father to his daughter.

### 7. The Sentencing Factors Under 18 U.S.C. § 3553(a) Also Favor Reduction of Mr. Dones' Sentence.

Finally, the sentencing factors under 18 U.S.C. § 3553(a) also favor reduction of Mr. Dones' sentence. Mr. Dones' offenses were unquestionably very serious: they were serious at

the time of sentencing and that remains so today. However, in light of the hardship of his incarceration due to COVID-19 and the other factors described above, a shorter term of imprisonment is now appropriate to reflect the seriousness of the offense, to promote general and specific deterrence and to render his sentence just.

Should an element of confinement be deemed still appropriate in fashioning the kind of sentence to be imposed, the Court has the ability to requirement home confinement. Moreover, the specific deterrence of imprisonment remains, given the prospect of a return to incarceration for any violation of supervised release.

The needed educational and vocational training have been denied him in prison. The needed drug rehabilitation has also been unavailable, and his medical needs have not been properly provided for. These sentencing considerations also favor early release.

## Conclusion

Mr. Dones presents extraordinary and compelling reasons for Section 3582(c)(1)(A) relief. Accordingly, the Court should reduce the term of imprisonment imposed upon him at the initial sentencing.

Respectfully submitted,

The Defendant,
ARCADIO DONES

Dated: May 27, 2021      ___/s/ James R. Smart_____
James R. Smart (ct20982)
McElroy, Deutsch, Mulvaney & Carpenter, LLP
30 Jelliff Lane
Southport, Connecticut 06510
Phone: 203-319-4039
Fax: 203-319-4034
Email: jsmart@mdmc-law.com

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 27, 2021, a copy of the foregoing motion is being filed electronically and will be served by mail on any party unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *James R. Smart*
James R. Smart

JRS/234446/0002/1751083v1
05/27/21-HRT/JRS